**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rodolfo MORALES, Paul Kolb, Jorge Manzano, Defendants–Appellants.**

**No. 87–5561.**

United States Court of Appeals, Eleventh Circuit.

April 6, 1989.

---

Benjamin S. Waxman, Weiner, Robbins, Tunkey & Ross, P.A., Miami, Fla., for Morales.

Louis M. Jepeway, Jr., Jepeway and Jepeway, P.A., Miami, Fla., for Kolb.

Joel Kaplan, Miami, Fla., for Manzano.

William T. Shockley, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for U.S.

Before TJOFLAT and EDMONDSON, Circuit Judges, and FLOYD R. GIBSON *, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge:

Appellants Jorge Manzano, Paul William Kolb, and Rodolfo Morales appeal their convictions, raising several issues which they argue warrant a reversal. The following issues are raised: 1) whether the district court erred in denying the appellants' various severance motions; 2) whether there was sufficient evidence to convict appellant Kolb; 3) whether the district court erred in denying appellant Manzano's motion to suppress evidence seized after a search of his apartment; and 4) whether remarks made by the district judge denied the appellants the effective assistance of counsel. For the following reasons we affirm the decision of the district court.

I. Background

On March 12, 1987, Ramon de Saint Germain, a confidential Drug Enforcement Administration (DEA) informant, spoke to Jorge Manzano and told Manzano that he was interested in purchasing cocaine. The two men arranged a meeting at a Publix Food Store in Northwest Miami; the meeting was planned for 2:15 p.m. that same

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

day. Manzano indicated that he had other business to transact at 2:30.

Germain arrived at the Publix Food Store between 2:00 and 2:10 p.m. When Manzano failed to show up, Germain used a pay phone to call Manzano's beeper. This call was made at 2:25 and Manzano arrived at the Publix within three minutes. Germain and Manzano then began negotiations for the sale of up to four kilos of cocaine. Germain indicated that he wanted to see a sample of at least one kilogram and he also wanted to know the price. Manzano told Germain that he lived in a nearby apartment and gave Germain the complete address. Manzano told Germain to come to the apartment at 6:00 p.m. and he would have at least one kilo of cocaine available there. Manzano then indicated that he had to go pay some Colombians for drugs in an unrelated transaction. At that time Paul Kolb pulled up in a red Ford Bronco. Manzano got into the Bronco and it left the area.

Germain called Manzano at 5:25 p.m. and told him that he could not make the 6:00 p.m. meeting. Thus, the two agreed to postpone the meeting until 7:00 p.m. Germain called Manzano again at 5:45 p.m. to confirm the 7:00 p.m. meeting. During this telephone conversation Germain also told Manzano that he needed three kilos of cocaine and Manzano agreed. At 5:55 p.m. Manzano called Germain and told him he had two kilos in the apartment but they were intended for another buyer. Manzano told Germain that he would be able to pick up Germain's merchandise in time for their 7:00 p.m. meeting. At 6:15 Manzano called Germain and told him that he had examined the cocaine and found that it was of poor quality. Manzano offered to sell this cocaine for $17,500 per kilo, but he also noted that he could get better stuff. Germain asked if he could take a look at the cocaine and Manzano agreed and told Germain to come on over.

At approximately 7:10 p.m. Germain arrived at Manzano's apartment where he was greeted by Michele Wagner. Wagner signalled Germain to enter the apartment. Once in the apartment Germain walked down a hallway to the master bedroom where Manzano was standing. Germain testified that Paul Kolb was in the apartment lying on a couch in the living room and also present in the apartment was Francisco Garcia who was in a second bedroom.

Germain then entered the bathroom of the master bedroom with Manzano. Manzano produced two packages of cocaine and Germain tested it. Germain agreed that the cocaine was of poor quality and he told Manzano that they could not do business. Manzano then told Germain that he could get three kilos of good stuff in an hour and a half. As Germain was in the hallway on his way out of the apartment he heard Manzano call out: "Let's go. Get me some tape. We have to change this." (R 5–121). Wagner then whispered something to Manzano and he responded "he knows, he knows, he knows." (R 5–122). Kolb, who was still on the couch, smiled at Germain as Germain left the apartment. Germain also noticed that Garcia was still in the second bedroom.

Shortly after Germain left the apartment DEA surveillance agents observed Manzano, Kolb, and Wagner leave the apartment and enter a white Chevrolet Cavalier. Wagner was carrying a dark-colored shoulder bag and Kolb was carrying some type of attache case or gym bag. DEA agents followed the Cavalier and after only a short distance it became clear that its occupants were aware that they were being followed. The Cavalier then quickly entered a Mobil Station which was located about an eighth of a mile from the apartment building. The DEA agents arrested the occupants of the car. Kolb drove the car, Manzano was riding in the front passenger seat, and Wagner was in the right rear seat. The case, which Kolb was observed carrying earlier when he entered the car, was open on the rear seat. It contained a mobile telephone which was in the "on" position. The black shoulder bag which Wagner carried contained two packages of cocaine.

After placing the car's occupants under arrest, the DEA agent-in-charge directed other DEA agents to secure Manzano's

apartment in order to prevent the destruction of evidence and additional cocaine which was believed to be in the apartment.

Five agents, accompanied by Germain, returned to the apartment. The agents positioned themselves around the apartment door and Germain knocked on the door. There was no immediate response and after a short time Germain knocked again while calling for "Pepe", Manzano's nickname. The door was unbolted by an occupant and when it was opened a few inches the DEA agents pushed the door completely open while announcing their identity. Agent Kobell entered the apartment and found himself face to face with Morales who was armed with a revolver. Morales raised the revolver shoulder height and pointed it directly at Agent Kobell. Kobell fired two shots at Morales who then retreated into the kitchen. At that point several shots were fired by other DEA agents providing cover for Agent Kobell who retreated out of the apartment. Approximately five minutes later Morales surrendered and was placed under arrest. Shortly after Morales surrendered, Garcia, who had been hiding in the bathtub during the exchange of gunfire, surrendered and was also placed under arrest. Morales sustained a single gunshot wound to the left cheek.

Metro–Dade police officers arrived and assumed control of the scene. The apartment was secured and a Metro–Dade police detective prepared a search warrant affidavit and a search warrant was later issued. A search of the apartment produced Morales's .45 caliber auto-loading handgun, a loaded .12 gauge shotgun which was purchased by Morales, four bottles of inositol powder,[1] twenty-three grams of a mixture of 3.1% pure cocaine hydrochloride and inositol, a Nexus speed balance scale, $5,490 in currency, a copy of the apartment lease naming Kolb and Manzano as its tenants, two rent receipts and a Florida Power and Light statement for the apartment all bearing Kolb's name, and a leather pouch containing Kolb's identification and a beeper.

On March 20, 1987, a grand jury indicted Manzano, Kolb, Morales, Wagner, and Garcia. Count I of the indictment charged Manzano, Kolb, and Morales with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982); Count II charged Manzano, Kolb, Morales, Wagner, and Garcia with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 (1982); Count III charged Manzano with resisting a DEA agent in violation of 18 U.S.C. § 111 (1982); Count IV charged Morales with using a firearm in a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Supp. IV 1986); and Count V charged Morales with assaulting a DEA agent with a deadly weapon in violation of 18 U.S.C. § 111 (1982).

All five defendants were tried in a joint jury trial. During the trial defendant Wagner was granted a severance after a conflict of counsel issue arose.[2] The remaining defendants filed various pretrial motions including several motions to sever and motions to suppress physical evidence recovered from the apartment. The district court denied these pretrial motions. The government proceeded to present its case and after it rested the trial judge acquitted Morales on Counts II and IV, and Garcia was acquitted on Count II.

After Morales was acquitted of Count II, the only count in which he and the other defendants were charged jointly, all of the defendants renewed their motions to sever which were again denied by the trial court. The defendants facing drug charges requested a severance alleging misjoinder with Morales who was charged with assault on a DEA agent. Morales also sought a severance alleging misjoinder with the remaining defendants who were facing drug charges. All of the defendants alleged prejudice. The jury returned a guilty verdict against Manzano on Counts I and II, but found him not guilty on Count III. Kolb was found guilty on Counts I and II, and Morales was found guilty on Count V. This appeal followed.

---

**1.** Inositol is often used as a cutting agent for cocaine.

**2.** Wagner is not a party in this appeal.

## II. Discussion

### A. Joinder and Severance

Appellants argue that their joinder in a single indictment and their joint trial violated Federal Rules of Criminal Procedure 8(b) and 14. We consider these claims individually because they must be evaluated under different standards. Initially we note, as in *United States v. Andrews*, 765 F.2d 1491, 1497 n. 1 (11th Cir.1985), *cert. denied sub nom.*, 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986):

> There is a threshold question as to whether this claim should be considered to be a Rule 8(b) claim or a Rule 14 claim, given the fact that the determinative event (the dismissal of the conspiracy claim) occurred after the drawing-up of the indictment (the event which is the subject of most Rule 8(b) claims) and before the trial (the events of which are the subject of most Rule 14 claims). It seems appropriate, however, that this be considered a Rule 8(b) claim, as appellants are arguing not merely that they were prejudiced by being indicted and tried together, but that given the dismissal of the conspiracy charge it is inappropriate for them to be charged in the same indictment because there is insufficient evidence that they were part of a single scheme. While at least one case has treated a similar claim arising from the dismissal of a conspiracy count as a Rule 14 claim, *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), this case is distinguishable, as the dismissal and the motion to sever occurred during the course of the trial.

In the instant case Morales was acquitted by the district court on the conspiracy count at the close of the government's case. Thus, although in *Schaffer* the Court treated such a claim as a Rule 14 claim, we will consider the appellants' claim under both Rule 8(b) and Rule 14. This is because not only did the appellants challenge their joinder when Morales was acquitted on the conspiracy count, but even before trial the appellants objected to their being charged in the same indictment.

A Rule 8(b) claim questions the propriety of joining two or more defendants in a single indictment in the first instance. In contrast, a Rule 14 claim assumes that the initial joinder of the defendants was proper but challenges their joint trial as unduly prejudicial. *See United States v. Bryan*, 843 F.2d 1339, 1342 (11th Cir.1988). Thus, because the two Rules address different concerns we will consider the appellants' challenge under both Rule 8(b) and Rule 14.

### 1. Joinder

The question of whether joinder under Rule 8(b) is proper is a question of law and subject to plenary review by this court. *United States v. Castro*, 829 F.2d 1038, 1044 n. 18 (11th Cir.1987), *withdrawn in part, on other grounds, and reh'g denied*, 837 F.2d 441 (1988). Rule 8(b) allows joinder of two or more defendants if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b).

There appears to be some conflict as to whether a reviewing court is limited to an examination of the face of the indictment in ruling on a Rule 8(b) misjoinder claim. For example, in *United States v. Grey Bear*, 863 F.2d 572 (8th Cir.1988), the Eighth Circuit en banc was split on this issue by an equally divided court. This quandry was also implicitly recognized by this circuit when it was stated: "Regardless of whether the reviewing court considers solely the indictment or both the indictment and the evidence adduced [at trial]...." *United States v. Castro*, 829 F.2d at 1045.

After carefully reviewing the great body of case law on this issue we conclude that Rule 8(b) is a pleading rule and joinder under Rule 8(b) is to be determined before trial by examining the allegations contained in the indictment.[3] This is the ap-

---

3. We note that the question of whether a reviewing court should narrow its inquiry to the four corners of the indictment in a Rule 8(b) claim

or whether the court should consider the evidence adduced at trial may have had far greater significance prior to the decision in *United*

proach taken by several of the circuits that have recently addressed this issue. *See, e.g., United States v. Kaufman,* 858 F.2d 994, 1003 (5th Cir.1988) ("propriety of Rule 8 joinder is determined by the initial allegations of the indictment...."); *United States v. Moya–Gomez,* 860 F.2d 706, 767 (7th Cir.1988) ("Because joinder under Rule 8 is a matter of pleading rather than proof...."); *cf. United States v. Lane,* 474 U.S. 438, 447, 106 S.Ct. 725, 730, 88 L.Ed.2d 814 (1986) ("once the Rule 8 requirements were met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14 ..."); *Schaffer v. United States,* 362 U.S. 511, 515, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960) ("Petitioners overlook, however, that the joinder was authorized under Rule 8(b) and that subsequent severance was controlled by Rule 14 ..."); *United States v. Friedman,* 854 F.2d 535, 561 (2nd Cir.1988) ("In evaluating the defendants' claims of misjoinder under Rule 8(b), then, our task is limited simply to determining whether the indictment properly alleged their participation in a RICO conspiracy."), *petition for cert. filed,* 57 U.S.L.W. 3155 (U.S. Aug. 13, 1988) (No. 88–278).

Although it is not entirely clear, we believe that this approach is also consistent with existing Eleventh Circuit case law. *See, e.g., United States v. Hewes,* 729 F.2d 1302, 1318 (11th Cir.1984) (Rule 8(b) joinder determined by examining the face of the indictment; only look beyond the indictment if joinder is based on improper legal interpretation or there are allegations of prosecutorial bad faith), *cert. denied sub nom.,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985).

The difficulty we see in allowing a court to analyze a Rule 8(b) claim based on the evidence adduced at trial is that it permits a reviewing court to conclude that initial joinder was improper based on information that was not and could not have been known to the prosecutor at the time the indictment was brought. We do not believe that it is appropriate to make a Rule 8(b) determination that initial joinder was improper simply because the government failed to prove all of the facts alleged in the indictment. *United States v. Garner,* 837 F.2d 1404, 1412 (7th Cir.1987) ("Rule 8(b) only requires that the conspiracy be alleged—there is no requirement that the government demonstrate, at the pleading stage, sufficient evidence to support joinder."), *cert. denied,* —— U.S. ——, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988); *United States v. Velasquez,* 772 F.2d 1348, 1354 (7th Cir.1985) ("[T]he test for misjoinder is what the indictment charges, not what the trial shows."), *cert. denied,* 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986). We believe that whether joinder is improper based on events occurring at trial is best dealt with under Rule 14.

Thus, for our purposes, we will look only to the indictment in order to determine if the appellants' initial joinder was proper under Rule 8(b). Nevertheless, because this case also presents an issue involving Rule 14 prejudicial joinder, in our consideration of the Rule 14 prejudicial joinder claim we will undertake an extensive review of the evidence adduced at trial in order to determine whether the appellants were prejudiced by their joint trial.

■ Looking only at the face of the indictment we have no trouble concluding that the appellants were properly joined in the same indictment. "[A] reviewing court

*States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Prior to the *Lane* case misjoinder under Rule 8(b) was considered per se reversible error in the Eleventh Circuit. *See, e.g., United States v. Andrews,* 765 F.2d at 1496. In *Lane,* however, the High Court determined that improper joinder under Rule 8(b) does not require reversal if the misjoinder was harmless error. Consequently, the question of whether it is proper to restrict a Rule 8(b) inquiry to the indictment is largely academic because in decid-

ing whether reversal is required, assuming joinder was improper, the reviewing court must necessarily look to the evidence adduced at trial to determine whether the defendant has been prejudiced. In many of these cases the issue can be approached by simply looking to the prejudice component of the defendant's claim and only in the rare case where the defendant has demonstrated prejudice will the court be required to address the issue of whether the joinder was actually proper.

must examine the face of the indictment. If the indictment's allegations, taken as true, establish a single conspiracy, and there is no claim of prosecutorial bad faith or an erroneous interpretation of law, the court must conclude that the initial joinder was proper." *United States v. Andrews,* 765 F.2d at 1496; *see also United States v. Badia,* 827 F.2d 1458, 1466 (11th Cir.1987) ("Joinder of defendants is appropriate where the indictment contains a single conspiracy that has been charged in good faith."), *cert. denied,* —— U.S. ——, 108 S.Ct. 1115, 99 L.Ed.2d 275 (1988); *United States v. Simon,* 839 F.2d 1461, 1472 (11th Cir.) ("Rule 8(b) ... makes clear that joinder of the defendants for trial is proper where the indictment charges multiple defendants with a single conspiracy and also charges some of the defendants with substantive counts arising out of the conspiracy."), *cert. denied,* —— U.S. ——, 109 S.Ct. 158, 102 L.Ed.2d 129 (1988). In the present case all of the appellants were named in the conspiracy count. Thus, based solely on the indictment the initial joinder was proper.

This case is strikingly similar to the *Schaffer* case. In *Schaffer,* a multi-party, multi-count indictment charged three separate substantive offenses each involving a distinct group of defendants. The fourth count in the indictment charged all of the defendants with conspiracy to commit the three separate substantive offenses charged in the first three counts. At the close of the government's case in a joint trial, the district court granted the defendants' motion for acquittal on the conspiracy count. The Supreme Court held that "[t]he *allegations of the indictment* having met the explicit provisions of Rule 8(b) as to joinder of defendants, we cannot find clearly erroneous the findings of the trial court and the Court of Appeals that no prejudice resulted from the joint trial." *Schaffer,* 362 U.S. at 513, 80 S.Ct. at 946 (emphasis added). The High Court elaborated on its holding:

It is clear that the initial joinder of the petitioners was permissible under that Rule [Rule 8(b)], which allows the joinder of defendants "in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." It cannot be denied that the petitioners were so charged in the indictment. The problem remaining is whether, after dismissal of the conspiracy count before submission of the cases to the jury, a severance should have been ordered under Rule 14 of the Federal Rules of Criminal Procedure.

*Id.* at 514, 80 S.Ct. at 947 (footnote omitted).

In the present case the facts are almost identical to the facts in the *Schaffer* case. Thus, although Morales was acquitted of the conspiracy charge this fact alone does not require a finding that he was misjoined with the other appellants. *See also United States v. Butera,* 677 F.2d 1376, 1385 n. 7 (11th Cir.1982) ("The absence of a conspiracy charge in the case before us is of no significance in the Rule 8(b) analysis."), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).

Moreover, even if we were to consider the propriety of the joinder under Rule 8(b) in the absence of the conspiracy count against Morales we would still conclude that there was no misjoinder.

This circuit noted in *United States v. Butera,* 677 F.2d at 1384, that in order to establish that the appellants have engaged in the "same series of acts or transactions" under Rule 8(b) the government must demonstrate that the acts alleged are united by some substantial identity of facts and/or participants. *See also United States v. Andrews,* 765 F.2d at 1496; *United States v. Dennis,* 645 F.2d 517, 520 (5th Cir.), *cert. denied,* 454 U.S. 1034, 102 S.Ct. 573, 70 L.Ed.2d 478 (1981).[4] We believe that the acts alleged in the conspiracy count and the acts alleged in Morales's assault charge meet the "same series of acts or transactions" test of Rule 8(b) because there is a

---

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit

adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

substantial identity of facts and, to some extent, participants.

The facts underlying the drug transaction in Counts I and II and Morales's assault charge in Count V are so closely connected that there would be an overlap of proof if the offenses were tried separately. *See, e.g., United States v. Castro,* 829 F.2d at 1045; *United States v. Corbin,* 734 F.2d 643, 649 (11th Cir.1984). This is especially true when we consider the government's theory of the case. The government contended that Morales was a part of the conspiracy and that his role in the conspiracy was to protect the cocaine that was being stored in the apartment. This theory explains why Morales would answer the door with a loaded revolver in his hand.

We briefly summarize our holding up to this point. In this case there have been no allegations that the conspiracy count involving all of the appellants was charged in bad faith. Thus we conclude that their initial joinder was proper on the face of the indictment. Furthermore, our conclusion would be the same even if Morales had not been charged in the conspiracy count because there was a substantial identity of facts and participants that united the appellants thus making joinder proper under Rule 8(b)'s same series of acts or transactions language.

Having already determined that Morales was properly joined with Manzano and Kolb, we need not discuss the converse of this argument, that is, whether Manzano and Kolb were improperly joined with Morales. If Morales's joinder with Manzano and Kolb was proper it necessarily follows that Manzano and Kolb were properly joined with Morales.

Finally, we note that even if a court concludes that a Rule 8(b) misjoinder claim is meritorious, reversal is not required if the court concludes that the misjoinder was harmless error. *United States v. Lane,* 474 U.S. at 449, 106 S.Ct. at 732. As noted previously, the application of the harmless error analysis to a Rule 8(b) claim by an appellate court may, as a practical matter, make academic the question of whether a Rule 8(b) inquiry is limited to an examination of the indictment. We believe that to some extent applying a harmless error analysis to a Rule 8(b) claim may have also blurred the distinctions that previously existed between a Rule 8(b) and a Rule 14 claim.[5] This is especially true from the perspective of the appellate court. Granted Rule 8(b) and Rule 14 address different concerns. However, these concerns are most salient in the district court. For example, Rule 8(b) is concerned with initial joinder and the district court must consider whether the joinder is proper on the face of the charging instrument. In contrast, Rule 14 addresses the problem of prejudicial joinder which arises when initial joinder under Rule 8(b) is technically proper but nevertheless prejudice will result if two or more defendants are tried in a joint trial.

■ Nevertheless, while a reviewing court must be acutely aware of these distinct concerns, reversal under either rule is not justified unless the defendant can establish prejudice.[6] We recognize that most courts articulate the standard of review in a Rule 14 case to be an abuse of discretion. Nevertheless, in order to establish that the district court abused its discretion the defendant must show "compelling prejudice." In contrast, a Rule 8(b) claim is generally considered a question of law and subject to plenary review by the appellate court. *United States v. Castro,* 829 F.2d at 1044 n. 18. In the aftermath of *Lane,* however,

---

5. Prior to the *Lane* decision, if a court concluded that Rule 8(b) misjoinder had occurred it was generally considered to be reversible error per se. A Rule 14 claim, however, required a defendant to establish some degree of prejudice before an appellate court would reverse. Thus, prior to *Lane,* by characterizing a claim as a Rule 8(b) claim rather than a Rule 14 claim a defendant had a far better chance of obtaining a reversal.

6. *But see United States v. Lane,* 474 U.S. at 449–50 n. 12, 106 S.Ct. at 732 n. 12 (the High Court left open the question of "whether the degree of prejudice necessary to support a Rule 14 motion for severance is identical to that necessary to require reversal for a Rule 8(b) error.").

an error involving misjoinder under Rule 8(b) "requires reversal only if the misjoinder results in actual prejudice...." *United States v. Lane,* 474 U.S. at 449, 106 S.Ct. at 732. Thus, to some extent for appellate purposes the *Lane* case may have collapsed Rules 8(b) and 14.

### 2. Severance

■ The second issue in this appeal concerns the district court's decision to try the appellants in a joint trial. Each of the appellants filed a pretrial motion for separate trials all of which were denied. The severance motions were renewed by the appellants at the close of the government's case when the district court acquitted Morales of the only count in the indictment that charged all of the appellants jointly. Once again the district court denied the motions for severance.

The appellants sought separate trials based on Federal Rule of Criminal Procedure 14 which provides in pertinent part:

If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires.

It is a well-settled principle that it is preferred that persons who are charged together should also be tried together. *United States v. Sans,* 731 F.2d 1521, 1533 (11th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985). This is particularly true in conspiracy cases. *United States v. Walker,* 720 F.2d 1527, 1533 (11th Cir.1983), *cert. denied sub nom.,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). Because of this long-standing preference for joint trials the denial of a motion for severance will be reversed on appeal only if the district court abused its discretion. *United States v. Bryan,* 843 F.2d at 1341. "To establish an abuse of discretion the defendant must demonstrate that without severance he was unable to receive a fair trial and that he suffered compelling prejudice against

which the trial court could offer no protection." *United States v. Magdaniel–Mora,* 746 F.2d 715, 718 (11th Cir.1984) (citations omitted).

In addition, we are guided by the Supreme Court which has declined to "fashion a hard-and-fast formula that, when a conspiracy count fails, joinder is error as a matter of law." *Schaffer,* 362 U.S. at 516, 80 S.Ct. at 948. With these precedents in mind we do not believe the district court erred in denying the appellants' motions for severance.

The appellants were not prejudiced by their joint trial because the trial lasted only five days and the jury was not overwhelmed by extensive testimony. After Wagner's motion for severance was granted and Garcia's charges were dismissed, there remained only three defendants in the case. With respect to these remaining defendants the jury was only required to consider four counts in the indictment. We believe that with this relatively small number of defendants and counts the jury was capable of separately considering the evidence as it pertained to each of the defendants. In addition, this case involved events which occurred during the course of one day. Thus, the jury was not required to consider testimony of several events which spanned a long time frame. The jury's ability to isolate the evidence and consider it against the separate defendants is best illustrated by its acquittal of Manzano on Count III, resisting a federal officer. *See, e.g., United States v. Dorsey,* 819 F.2d 1055, 1058 (11th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988); *United States v. Hewes,* 729 F.2d at 1319.

We also note that the district court instructed the jury to consider each defendant and each offense separately. In its charge to the jury the court stated:

A separate crime or offense is charged with against one or more of the defendants in each count of the indictment. Each offense and the evidence pertaining to it should be considered separately. Also the case of each defendant should be considered separately and individual-

ly. The fact [sic] you may find one or more of the defendants guilty or not guilty of any one of the offenses charged should not affect your verdict as to any other offense or any other defendant.

I caution you, members of the jury, that you are here to determine from the evidence in this case, whether the defendant is guilty or not guilty. The defendant is on trial only for the specific offense charged—alleged in the indictment. (R 9–120–21).

.　　.　　.　　.　　.

[W]e will have brought to you a copy of the indictment so you can carefully go through the entire indictment. Be sure you see which charge applies to which defendant and keep [sic] charges clearly in mind. (R 9–124).

■ A joint trial is necessarily going to involve some degree of prejudice. The inquiry to be made by this court is whether the prejudice outweighs the public's interest in the joint trial. Thus, we must consider whether the prejudice inherent in the joint trial was minimized by cautionary instructions from the bench. *United States v. Hewes,* 729 F.2d at 1318–19. As noted the district court gave appropriate cautionary instructions to the jury and the appellants have not shown any examples of improper cumulation of evidence by the jury or a prejudicial spillover effect as a result of the joint trial. *United States v. Badia,* 827 F.2d at 1466 ("Absent evidence to the contrary, we presume that the jury was able to follow the court's instructions and evaluate the evidence against each defendant independently."). Additionally, it is significant that if the appellants had been tried separately it would have resulted in extensive duplication of evidence. *See United States v. Casamayor,* 837 F.2d 1509, 1512 (11th Cir.1988), *cert. denied sub nom.,* —— U.S. ——, 109 S.Ct. 813, 102 L.Ed.2d 803, (1989). In particular, much of the evidence concerning the drug transaction would have been admissible in a separate trial of Morales's assault charge.

Finally, the evidence introduced at trial implicating Manzano and Kolb in the drug transaction alleged in the indictment was compelling. Similarly, there can be little doubt as to Morales's guilt with respect to his assault charge. *United States v. Lane,* 474 U.S. at 450, 106 S.Ct. at 732 (joinder error was harmless given the "overwhelming evidence of guilt."). Accordingly, the appellants have failed to establish prejudicial joinder under Rule 14.

### B. Sufficiency of the Evidence to Support Kolb's Conviction

Kolb argues that the district court erred when it denied his Motion for Judgment of Acquittal on the possession and conspiracy counts. Kolb maintains that the government failed to produce sufficient evidence of his possession of cocaine and participation in the drug conspiracy. We disagree. As we shall explain in the paragraphs that follow this is not a case of mere presence or guilt by association. The government produced sufficient evidence to support Kolb's convictions.

In reviewing the sufficiency of the evidence to support a guilty verdict we must view the evidence and all of the reasonable inferences to be drawn from the evidence in the light most favorable to the government. *United States v. Cruz–Valdez,* 773 F.2d 1541, 1544 (11th Cir.1985) (en banc), *cert. denied sub nom.,* 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). We will not undertake a reweighing of the evidence or a reexamination of the credibility of the witnesses. Rather we will assume that the jury credited the testimony of the government's witnesses. *United States v. Dorsey,* 819 F.2d at 1059. In addition, we are "mindful that it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Casamayor,* 837 F.2d at 1512 (citation omitted). If we are satisfied that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt then we must affirm Kolb's convictions.

Count I of the indictment charged Kolb, Manzano, and Wagner with possession with intent to distribute cocaine. Count II charged these same defendants, as well as

Morales and Garcia, with conspiracy to distribute cocaine. In order to sustain Kolb's conviction under Count I it is necessary to show: "(1) knowing (2) possession of a controlled substance (3) with intent to distribute it." *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983); *United States v. Alvarez,* 837 F.2d 1024, 1027 (11th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2003, 100 L.Ed.2d 234 (1988). To sustain Kolb's conviction under Count II of the indictment the government must prove that an agreement existed between Kolb and at least one other person to distribute cocaine and that Kolb knowingly and voluntarily joined or participated in the conspiracy. *United States v. Vera,* 701 F.2d at 1357.

■ We first consider the sufficiency of the evidence to support Kolb's conviction for possession with intent to distribute. Because a conviction under both the possession count and the conspiracy to distribute count requires a similar showing of guilty knowledge and intent, at this point in our analysis of the possession count we will focus only on the sufficiency of the evidence establishing the element of possession of the controlled substance.

"Possession may be actual or constructive and may be proved by circumstantial as well as direct evidence.... A person who owns or exercises dominion and control over a motor vehicle or residence in which contraband is concealed may be deemed to be in constructive possession of the contraband." *Id.* (citations omitted). The following evidence is probative of the possession count and was sufficient to support Kolb's conviction. The government produced a copy of the lease for the apartment where the drug transaction took place. The lease listed Kolb and Manzano as the residents and the lease was signed by Kolb. The government also produced two rent receipts bearing Kolb's name dated March 6, just six days prior to the drug transaction involved in this appeal. Finally, the government introduced a Florida Power and Light statement for the apartment which listed Kolb as the customer. This evidence supports Kolb's conviction of the possession count as well as the conspir-

acy count. This evidence connecting Kolb to the apartment would allow a reasonable jury to find that Kolb exercised dominion and control of the apartment. As just noted a person who exercises dominion and control over a residence in which contraband is concealed may be deemed to be in constructive possession of the contraband. Thus, we believe that this evidence would allow a reasonable jury to convict Kolb of the possession count. Similarly, as discussed below this same evidence would allow a jury to conclude that Kolb was an active participant in the cocaine conspiracy.

■ We now consider the sufficiency of the evidence with respect to Kolb's conviction of conspiring to distribute cocaine. "[D]irect evidence of the elements of a conspiracy is not required. A defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." *Id.* (citations omitted).

Thus, although no direct evidence of Kolb's knowledge with respect to the cocaine conspiracy was presented, there was ample circumstantial evidence which could allow a reasonable jury to find the requisite guilty knowledge. For example, Kolb was driving the car when the DEA agents pulled it over and made the arrests at issue in this appeal. And, when the DEA agents were detected Kolb began driving the car in an evasive manner. *United States v. Alvarez,* 837 F.2d at 1028 (evasive activity probative of guilty knowledge). Furthermore, Kolb was involved in numerous acts which furthered the conspiracy. Indeed, it would be unreasonable to conclude that Kolb was not an active participant in light of the evidence that suggests that he chauffeured Manzano between drug transactions. *See United States v. Cruz–Valdez,* 773 F.2d at 1546 ("A jury may find knowledgeable voluntary participation from presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present."); *United States v. Moya–Gomez,* 860 F.2d at 759.

The following evidence established Kolb's involvement and active participation in this drug conspiracy. Kolb was driving the Ford Bronco that picked up Manzano at the Publix Food Store after Manzano met with Germain, the DEA confidential informant, to discuss a drug purchase. Manzano made it clear to Germain that he would be conducting other drug deals before and after their meeting. Kolb was Manzano's driver and provided the transportation throughout the day. When Kolb was arrested, along with Manzano and Wagner, he was driving the vehicle that abruptly changed its course after the DEA surveillance team was detected. The mobile telephone that the conspirators used in their drug transactions was carried out of the apartment and placed in the car by Kolb. In addition, Wagner, who was Kolb's girlfriend, carried the bag that contained the cocaine.

As this circuit noted in *Cruz–Valdez,* "juries and courts know much more about commerce in controlled substances than they did a decade or more ago." 773 F.2d at 1547. In that case this circuit noted some of the "familiar realities" of drug transactions and concluded that under some circumstances such realities are probative in determining whether a drug offense has occurred. In the *Cruz–Valdez* case it was recognized that a reasonable jury may conclude that "a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders." *Id.*

Among the familiar circumstances of a cocaine distribution conspiracy involved in this case are the widespread use of beepers by its participants, the use of a mobile telephone, the presence of several bottles of inositol powder, a speed balance scale, and several firearms. Beepers and mobile telephones allow the conspirators to maintain contact with one another and their customers and also facilitate the distribution of their wares. Inositol powder is used as a cocaine cutting agent and the speed balance scale is used to measure the cocaine. We do not suggest that the presence of these facts alone establishes a cocaine conspiracy. We merely recognize that these are facts which are probative

and when combined with the other evidence presented in this case may enable a reasonable jury to conclude that a conspiracy existed.

■ With regard to the requirement of an agreement, we note that the existence of an agreement in a conspiracy case is rarely proven by direct evidence that the conspirators formally entered or reached an agreement. *United States v. Simon,* 839 F.2d at 1469; *United States v. Moya–Gomez,* 860 F.2d at 758 ("A formal agreement need not be demonstrated although agreement is the primary element of a conspiracy."). The more common method of proving an agreement is through circumstantial evidence. In the present case the conduct of Kolb and Manzano, as well as the lease which was in both of their names, is sufficient evidence to establish this essential element of the conspiracy.

We also note that Kolb's own trial testimony undoubtedly undermined his credibility in the eyes of the jury. In *United States v. Eley,* 723 F.2d 1522, 1525 (11th Cir.1984), this court noted that "[a] false explanatory statement may be viewed by a jury as substantive evidence tending to prove guilt.... Moreover, wholly incredible explanations may also form a sufficient basis to allow the jury to find that the defendant had the requisite guilty knowledge." *Cf. United States v. Cotton,* 770 F.2d 940, 945 (11th Cir.1985) ("When a defendant takes the stand in a criminal case, he subjects himself to a determination by the jury of his credibility. The jury is free to disbelieve him and reject his explanation as complete fabrication."). Kolb took the stand in his own defense and provided an incredulous account for his presence in the apartment while the drug transaction took place as well as his involvement in shuttling Manzano between drug transactions. In the present case Kolb's explanation of his involvement is so unbelievable that "it gives rise to positive evidence in favor of the government." *United States v. Eley,* 723 F.2d at 1525; *see also United States v. Contreras,* 667 F.2d 976, 980 (11th Cir.), *cert. denied,* 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982). Thus, Kolb's own testi-

mony provided evidence tending to establish his guilt.

### C. The Validity of the Search of Manzano's Apartment [7]

■ Manzano argues that the district court erred when it denied this motion to suppress evidence which was seized from his apartment after his arrest. Manzano argues that the warrantless, nonconsensual entry into his apartment after he was arrested at a location a distance away resulted in an improper seizure of physical evidence. Manzano maintains that the government lacked probable cause to believe that there was any contraband or evidence within the apartment.

In response, the government argues that the apartment was properly seized because the DEA agents had probable cause to believe that the apartment contained contraband and evidence based on information obtained from the confidential informant. Thus, due to the exigent circumstances the government argues that it properly seized the apartment.

In *United States v. Burgos,* 720 F.2d 1520, 1525 (11th Cir.1983), this circuit noted "that circumstances sometimes preclude the obtaining of a warrant and therefore has allowed warrantless searches and seizures of a residence where both probable cause and exigent circumstances exist." We affirm the district court's denial of the motion to suppress because we find that the DEA agents had probable cause to seize the apartment and the exigent circumstances allowed the agents to seize and secure the apartment without first obtaining a warrant.[8]

"Probable cause to search exists where the facts lead a reasonably cautious person to believe that the 'search will uncover evidence of a crime.'" *United States v. Burgos,* 720 F.2d at 1525 (quoting *United*

*States v. Rojas,* 671 F.2d 159, 165 (5th Cir. Unit B 1982)). In the present case it is clear that the agents had probable cause to believe that the apartment contained evidence involving the cocaine conspiracy. The probable cause was based on the statements Manzano made to Germain, the undercover informant, over the telephone and while in the apartment. Manzano told Germain in a telephone conversation that he had two kilograms of cocaine in the apartment but the packages were for another buyer. Manzano assured Germain that he would have additional cocaine for Germain in time for their planned meeting. These facts gave the DEA agents probable cause to believe that at least two additional kilos of cocaine remained in the apartment after Manzano was arrested.

■ Nevertheless, in order to justify a warrantless entry it is not enough to merely establish probable cause. In addition, the government must establish the requisite exigent circumstances. "The term 'exigent circumstances' refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Burgos,* 720 F.2d at 1526. This court has noted that the risk of removal or destruction of narcotics involves exigent circumstances. *Id.* (citing *United States v. Rubin,* 474 F.2d 262 (3d Cir.), *cert. denied sub nom.,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973)); *see also United States v. Harris,* 713 F.2d 623, 626 (11th Cir.1983). In addition, the district court's finding of exigent circumstances must be sustained unless it is clearly erroneous. *United States v. Gardner,* 553 F.2d 946, 948 (5th Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978).

The following facts known to the DEA agents clearly illustrate the exigent circum-

---

**7.** As noted earlier, the apartment was leased by both Manzano and Kolb. However, for convenience in this portion of the opinion we refer to the apartment as exclusively Manzano's.

**8.** The conduct of the DEA agents in this case was even less intrusive than a search because they merely seized and secured the apartment

until a search warrant could be obtained. *See Segura v. United States,* 468 U.S. 796, 806, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984) ("Different interests are implicated by a seizure than by a search.... A seizure affects only the person's possessory interests; a search affects a person's privacy interests.") (citations omitted).

stances in this case. The DEA agents knew that the occupants of the car were expected back at the apartment in approximately one hour. In addition, when the car was stopped and searched the agents discovered a mobile telephone which was in the "on" position, thus making it operational. While the agents could not be certain, they suspected that the mobile telephone may have been used to alert others waiting in the apartment. This information coupled with the evasive and erratic behavior of those riding in the car before it was stopped gave the DEA agents reason to believe that they had to act quickly in order to avoid possible destruction of evidence in the apartment. It is also significant that the car was stopped within an eighth of a mile of the apartment. This close proximity to the apartment concerned the agents because they believed that others affiliated with the apartment may have observed the arrest of their associates.

We have no trouble in concluding that these facts justify the seizure of the apartment. These facts support a finding of probable cause as well as the necessary exigent circumstances. We also note that the DEA agents only planned to secure the apartment and detain its occupants until a warrant to conduct a search could be obtained through regular procedures.

In fact this is exactly what the agents did. The DEA agents secured the apartment and when the Metro–Dade police officers arrived on the scene they took control of the apartment. The Metro–Dade officers obtained a search warrant and conducted a search of the apartment in accordance with established procedures. In *United States v. Turner*, 650 F.2d 526, 527 (4th Cir.1981), the Fourth Circuit upheld a similar seizure of an apartment and subsequent search conducted pursuant to a properly issued search warrant. This provides additional support for our conclusion that the district court properly denied Manzano's motion to suppress the evidence seized in his apartment. See also *United States v. Segura*, 468 U.S. at 798, 104 S.Ct. at 3382, wherein the Supreme Court held:

> that where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

(footnote omitted).

## D. Remarks of the District Judge

■ The final issue in this appeal involves remarks made by the trial judge. On the day before closing argument the district judge commented:

> The lawyers want 40 minutes apiece. It is too hot to listen to hot air in this hot air so we'll recess until the morning and hopefully it will cool down by then. Nine o'clock in the morning please. Same instructions. Don't discuss this matter with anyone. Don't permit anybody to discuss it with you. It still is not time to form or express any opinion about the merits of the case. (R 8–232).

The appellants challenge these remarks as a violation of the Sixth Amendment right to the effective assistance of counsel. It has been consistently held that an appellate court "will not reverse a conviction unless the comments of the Trial Judge are so prejudicial as to amount to a denial of a fair trial." *United States v. Preston*, 608 F.2d 626, 636 (5th Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980). Furthermore, "[a] clear effect on the jury is required to reverse for comment by the trial judge." *United States v. Rochan*, 563 F.2d 1246, 1250 (5th Cir.1977).

In *United States v. Preston*, 608 F.2d at 636, this court identified three factors that weighed in favor of a finding that the comments of a trial judge were not reversible error. These factors were: "(1) the comments 'occupied but a few seconds of a lengthy trial;' (2) the comments 'were directed to defense counsel rather than to the jury;' and (3) the Trial Judge advised the jury to disregard any intimation by the Court relating to the facts of the case."

*Id.* (quoting *United States v. Onori*, 535 F.2d 938, 944 (5th Cir.1976)).

In the instant case the judge's comments were very short, and moreover when put into context, they were not improper. First, the comments were very isolated and made during the course of a five day trial. Second, the comments were not directed to either counsel for the defense or counsel for the United States.[9] *See, e.g., United States v. Butera*, 677 F.2d at 1381.

■ Third, the trial judge instructed the jurors that his rulings and comments should not be considered in reaching their decision. Just prior to the opening arguments in the case the trial court instructed the jury as follows:

> Now, from time to time during the course of this trial, I will be making rulings of law on objections or motions made by the lawyers. You should not infer or conclude from any ruling I make that I have any opinion on the merits of the case favoring one side or the other. If I sustain an objection to a question that goes unanswered by the witness, you should not speculate on what answer might have been given nor should you draw any inferences or conclusions from the question itself. (R 5–47).

In addition, in its final charge to the jury the court gave the following instruction:

> As stated earlier you must consider only the evidence that I have admitted in the case. The term "evidence" includes the testimony of the witnesses and the exhibits admitted in the record. Remember that anything the lawyers say is not evidence in the case. It is your own recollection and interpretation of the evidence that controls. What the lawyers say is not binding upon you. *Also, you should not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision concerning the facts.* (R 2–85–4).

(emphasis added). Thus, assuming *arguendo* that the appellants were prejudiced by the remarks, we believe that the court's instructions cured any prejudice that may have lingered in the jury's mind. We also note that the comments did not address any disputed issues involved in this case.

Finally, the comments were made at the close of a lengthy trial day on May 4, 1987 in Miami, Florida. Presumably from the nature of the comments it was a very warm day in Miami on May 4. Thus, the comments, when put into this context, appear to be an attempt at humor on the part of the trial judge. And while on appeal the appellants do not see the humor in these comments and claim that they are reversible error, we note that the appellants failed to object to the comments when they were made.

Appellants phrase this claim as a violation of their Sixth Amendment right to effective assistance of counsel. While we do not doubt that a case may arise in which a trial judge's remarks and limitations on closing argument may rise to the level of a Sixth Amendment violation, this is certainly not such a case.

We conclude that the trial judge's comments did not deprive the appellants of a fair trial because they did not involve any disputed issues in the case and when placed in context they were not improper.

### III. Conclusion

After a careful review of the record of the proceedings conducted in the district court, we are convinced that each of these appellants received a fair trial. The district court did not err in denying the motions for separate trials because joinder was proper under Rule 8(b) and the district court did not abuse its discretion in denying severance under Rule 14. Furthermore,

---

**9.** Appellants argue that the comments were directed at defense counsel and were an attempt by the district judge to discredit defense counsel in the eyes of the jury. We have carefully read the transcript and find this assertion to be wholly without merit. It is absolutely clear from the record that the trial judge did not direct his comments towards any particular attorney involved in this case.

**1578**

the appellants were not prejudiced by the joint trial. With respect to Kolb's assertion that there was insufficient evidence to sustain his conviction, the assertion is refuted by extensive and persuasive evidence that would allow a reasonable jury to convict him of the crimes which he was charged with committing. The next issue raised in this appeal was Manzano's challenge to the search of his apartment. We conclude that the DEA properly seized and secured the apartment because it had probable cause to believe that contraband was concealed in the apartment and in danger of destruction. In addition, exigent circumstances relieved the DEA of the obligation to secure a search warrant before it seized the apartment. Finally, the appellants' argument that the remarks made by the district court denied them the effective assistance of counsel is without merit.

Accordingly, the judgment of the district court is

AFFIRMED.