[Nos. 37906-2-I; 37907-1-I; Division One. December 22, 1997.]
37908-9-I.

THE STATE OF WASHINGTON, *Respondent*, v. JUVENTINO J. FERNANDEZ, ET AL., *Appellants*.

*Stella S. Buder* of *Washington Appellate Project; James R. Dixon* of *Nielsen, Broman & Associates, P.L.L.C.; Douglas J. Ende* of *Ende, Subin & Philip*; and *Catherine L. Floit*, for appellants.

*David R. Needy, Prosecuting Attorney*, for respondent.

COLEMAN, J. — The three appellants in this consolidated appeal were tried together and convicted for operating a drug house, possession of cocaine with intent to deliver, and conspiracy to deliver cocaine. While the parties began trial under the assumption that a confidential informant would not testify for the State, we hold that the trial court's later decision to allow her testimony was not prejudicial error. Viewing the record in the State's favor, we hold that the possession with intent and conspiracy convictions were supported by sufficient evidence. But because there is no evidence that anyone other than the appellants used drugs in their house, we reverse the drug house convictions and remand. We also hold that the sentencing court erred by counting the charged crimes separately in computing the

appellants' offender scores because they involved the same criminal conduct. We thus remand for resentencing.

Juvenito Fernandez, Jeffrey Cummings, and Maria Huerta were prosecuted together for participating in illegal drug activity at a house in Mount Vernon. Cummings and Huerta concede that they lived at the house with their children. Fernandez, Huerta's son by another man, claims that he lived elsewhere. But the landlord testified that although only Huerta had signed the lease, all three defendants rented the small house. He also said that he frequently went to the house and saw Fernandez there. Neighbors believed that Fernandez lived at the house because he was usually there.

After suspecting drug activity, a narcotics task force sent two confidential informants to buy cocaine at the house on five separate occasions. All five buys were successful. The State relied on these controlled purchases, without naming the informants, in establishing probable cause to arrest Fernandez, Cummings, and Huerta.

Four days before trial, the prosecutor informed defense counsel that he was going to subpoena Tiffany Sutliffe, one of the confidential informants. While the State's witness lists had included informant Yvonne Fisher, this was the first mention of Sutliffe's name. At the pretrial hearing that morning, defense counsel objected to this late surprise. The prosecutor explained that he had not planned to use Sutliffe's testimony because he did not know where to find her. But he had fortuitously encountered Sutliffe in the courthouse when she appeared for another matter.

After she was subpoenaed, Sutliffe obtained independent counsel and refused to speak with the defense lawyers. On the morning of trial, Sutliffe's attorney informed the court that his client would refuse to testify based on a claim of self-incrimination. The prosecutor wanted to call Sutliffe to the stand anyway. Defense counsel objected, and the court told the parties to assume that Sutliffe would not testify at trial. But it warned that it would order Sutliffe to take the

stand if the defense attorneys mentioned to the jury that she was a missing witness. The court ordered Sutliffe to appear that afternoon so that it could evaluate her claim of privilege.

When Sutliffe appeared in camera, she immediately asserted her Fifth Amendment privilege. Although the prosecutor offered her immunity, she indicated that she preferred jail time over testifying against the defendants. The court found that Sutliffe was "firm in her determination to refuse to testify [and] sincere in being prepared to go to jail if necessary to avoid testifying[.]" The prosecutor then requested a ruling on whether he could call Sutliffe to the stand to assert her claim of privilege. The court ruled against the State.

> I thought I made myself clear, I will make myself clear. No, I don't think it's proper for the State under these circumstances to go through the futility of putting her on the stand, and I don't think it's appropriate that in effect the jury be asked to draw some conclusions from that, which I think is what is basically being asked.

But the court noted that Sutliffe would remain under subpoena throughout trial and advised that it would reconsider the issue if the State produced authority that "might be helpful in getting her testimony[.]"

The court then ruled that Sutliffe could "not be mentioned in jury selection" nor described as a potential witness. Defense counsel claimed that their cases would be prejudiced if the State were later allowed to call Sutliffe to the stand. The court replied that it would deal with that situation when and if it arose. By written order, the court ruled that "[t]he State is not entitled to present Ms. Sutliffe as a witness in this matter, and the state shall not attempt to call her as a witness in front of [the] jury."

After voir dire, which is not reproduced in the record, the prosecutor gave his opening statement. He described the controlled drug purchases and mentioned Sutliffe by name. Defense counsel objected that naming Sutliffe

violated the court's pretrial order. The court disagreed with the defense's characterization of its prior ruling.

> My recollection about Miss Sutliffe is slightly different. That she was a witnesses [sic] who refuses to testify. It was understood among us that there would not be a reference made to the fact—I wasn't going to let [the prosecutor] show that, get her on the stand, take the Fifth, and I wasn't going to let you argue there is a missing witness.

Defense counsel then gave their opening statements. Huerta's counsel claimed that the State would not be able to prove its case. Fernandez' attorney claimed that there was no evidence linking his client to the alleged crimes. Cummings' attorney spoke for about a minute, asking the jury to pay close attention to the evidence.

In the midst of trial, the State filed a motion to reconsider the ruling that Sutliffe could not be called to the stand. Citing *State v. Lougin*, 50 Wn. App. 376, 382, 749 P.2d 173 (1988), the State argued that Sutliffe's right to invoke the Fifth Amendment should be determined on a question-by-question basis. The court agreed that Sutliffe would have to assert her claim of privilege in response to specific questions. Defense counsel moved for a mistrial, claiming that they had relied on the ruling that Sutliffe would not testify when they conducted voir dire and opening statements. The court denied the motion.

The court then had the prosecutor question Sutliffe outside the presence of the jury. After initially refusing to answer questions, Sutliffe admitted that she had bought drugs from the defendants during controlled buys. She then revealed that all three defendants had threatened her not to testify at trial. She claimed that Huerta had called her a "dead bitch." Defense counsel argued that these late surprises were unfairly prejudicial. When the court recessed at 10:55, it gave defense counsel the opportunity to interview Sutliffe until 1:30.

That afternoon, Sutliffe testified before the jury without asserting the privilege against self-incrimination. She

stated that she had bought cocaine at the defendants' house
on a number of occasions and that all three had been there.
She claimed that she did not need to ask for drugs because
whoever happened to be home would ask " 'How much?' "
Sutliffe remembered buying drugs from Cummings on one
occasion. Although she could not recall whom she had dealt
with on other days, Sutliffe testified that either Cummings,
Huerta, or Fernandez would sell the drugs, depending on
who was at the house to "take care of it[.]" Huerta once
told her that she was stupid for doing drugs while she was
pregnant. Sutliffe also related the defendants' threats. On
cross-examination, defense counsel exposed Sutliffe's drug
addiction and her incentive to regain custody of her chil-
dren from the State in a dependency matter.

Fisher, the other informant, did not testify. But four
members of the drug task force testified about Fisher's and
Sutliffe's controlled buys. Three neighbors also testified to
a dramatic increase in pedestrian and vehicular traffic on
their street after the defendants moved in. Numerous visi-
tors would come to the house for two to ten minutes and
then leave. One witness estimated that as many as 15 cars
an hour were coming and going from the house. Fernandez
appeared to greet their visitors with the greatest frequency,
but the other two defendants also did so at various times.
One neighbor said that Fernandez and Cummings would
lean into the cars that stopped on the street. The unusual
activity occurred at all hours of the day and occasionally
the traffic completely blocked the street. The neighbors
also testified that Huerta had attended a block watch meet-
ing to deny accusations of drug activity at her house.

On February 21, 1995, after five controlled buys, the po-
lice executed a search warrant at the house. They found
Fernandez asleep in the living room. Huerta and Cum-
mings were in a bedroom. In the house's only bathroom,
the police found a number of items that indicated drug
activity: pipes, a beaker, measuring spoons with white resi-
due and burn marks, burnt tweezers, sandwich bags, and a
propane torch. They also found a knife with a hollow handle

that contained about 14 grams of cocaine. The cocaine was evenly packaged in seven plastic bags. Empty plastic bags in the bathroom had been tied in knots and ripped open. A detective testified that this was a common way to package cocaine and that the cocaine that the informants had purchased was similarly packaged.

In Huerta and Cummings' bedroom, the police found a fireproof strong box. Inside it were 20 bags, each containing about a half gram of cocaine. The police also found a number of weapons and a triple beam scale in the bedroom. The witnesses testified that these items were common in the drug trade.

The defense presented no evidence after the State rested. Defense counsel argued in closing that Sutliffe was not a credible witness. The jury found all three defendants guilty of operating a drug house, possessing cocaine with intent to deliver, and conspiracy to deliver cocaine. At sentencing, the court rejected defense counsels' arguments that the three crimes encompassed the same criminal conduct and counted each conviction separately in computing the defendants' offender scores. It also ordered random urinalysis tests as a community placement condition.

We first turn to the convictions for operating a drug house. The relevant statute provides in part:

> It is unlawful for any person . . . knowingly to keep or maintain any . . . dwelling . . . which is resorted to by persons using controlled substances in violation of this chapter for the purpose of using these substances, or which is used for keeping or selling them in violation of this chapter.

RCW 69.50.402(a)(6). The defendants argue that there is insufficient evidence that they knowingly kept or maintained a house which others resort to for the purpose of using drugs. We agree that the evidence did not support this alternative means of violating the statute and therefore reverse and remand the drug house convictions.

■ Initially, we note that the evidence was sufficient to show that the defendants knowingly kept or maintained

the house. As discussed above, the jury was entitled to find that Fernandez lived with Huerta and Cummings in the small house where a substantial amount of drug trafficking occurred. It could also find that the defendants maintained the house to sell or store drugs.

There was no evidence, however, to support a finding that drug users resorted to their house for the purpose of using cocaine. RCW 69.50.402(a)(6). The totality of the circumstances and the items seized during the search allow an inference that someone had used drugs in the house. But there is nothing in the record to indicate who. We disagree with the State that the drug house statute's use prong applies regardless of who uses the controlled substances. We construe the statute to prohibit maintaining a house that others resort to for the purpose of using drugs. While persons other that the defendants may have resorted to the house to use drugs, it is just as likely, if not more probable, that the defendants were the ones using the drugs.

 Because the record contains insufficient evidence that anyone other than those accused of maintaining the house ever used drugs in the house, the jury was not entitled to convict under this prong of the drug house statute. The State did not elect between the alternative means, and the general verdict form does not reveal which prong the jury used to convict. Because it may have convicted the defendants under the unsupported use prong, we must reverse the defendants' convictions and remand for retrial on the drug house charges. The State's failure to produce evidence as to illegal drug use under RCW 69.50.402(a)(6) means that it may retry the defendants only on the theories that they maintained the house to store or sell drugs.

 We reject the defendants' vagueness challenge to RCW 69.50.402(a)(6). Because no First Amendment rights are implicated, we evaluate the statute as applied to the facts of this case. *City of Spokane v. Douglass*, 115 Wn.2d 171, 182-83, 795 P.2d 693 (1990). A statute is unconstitutionally vague if it fails to either: (1) define criminal

conduct with sufficient definiteness that ordinary people can understand what conduct is proscribed; or (2) provide ascertainable standards of guilt to protect against arbitrary enforcement. *See State v. Halstien*, 122 Wn.2d 109, 117, 857 P.2d 270 (1993). Statutes are presumed constitutional, and the challenging party carries the burden of proving that it is overly vague beyond a reasonable doubt. *Halstien*, 122 Wn.2d at 118; *State v. Coria*, 120 Wn.2d 156, 163, 839 P.2d 890 (1992).

■ ■ We hold that the appellants have failed to meet their heavy burden. Persons of common intelligence would understand the statute to prohibit a person from knowingly maintaining a house where drugs are used by others, kept, or sold. Using the mental state of knowingly as an element does not render a statute unconstitutionally vague. *State v. Sigman*, 118 Wn.2d 442, 446-47, 826 P.2d 144, 24 A.L.R. 5TH 856 (1992). The term "maintain" contemplates some degree of control over the premises and making it available for the illegal use. *See United States v. Clavis*, 956 F.2d 1079, 1090 (11th Cir. 1992). The evidence showed that the three defendants lived in the house where they stored and sold drugs. As applied to this case, we hold that the statute provided both fair warning that it prohibited the defendants' conduct and adequate standards to prevent arbitrary enforcement.

We affirm each defendant's conviction for possession with intent to deliver and conspiracy to deliver a controlled substance. We reverse and remand their convictions for operating a drug house. We also reverse the calculation of the defendants' offender scores and remand for resentencing consistent with this opinion.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

BAKER, C.J., and KENNEDY, J., concur.