[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 6, 2011
JOHN LEY
CLERK

No. 08-12379
_____

D. C. Docket No. 07-20772-CR-FAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DULCE CASTELLANOS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 6, 2011)

Before EDMONDSON and PRYOR, Circuit Judges, and EVANS,* District Judge.

EVANS, District Judge:

_____

* The Honorable Orinda Evans, United States District Judge for the Northern District of Georgia, sitting by designation.

Dulce Castellanos appeals her convictions for conspiracy to possess with intent to distribute one kilogram or more of a substance containing heroin and five kilograms or more of a substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846 (Count 1), conspiracy to commit money laundering that allegedly took place between June 2003 and October 23, 2007, in violation of 18 U.S.C. § 1956(a)(1)(B)(I), all in violation of 18 U.S.C. § 1956(h)  (Count 4), and money laundering that allegedly took place on March 15, 2007, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(I) and 1956(a)(2) (Count 6).

Dulce Castellanos raises two main issues on appeal.  First, she argues that the district court erred in denying her motion to suppress evidence obtained in a search of a vehicle she drove and in a search of her residence.  Second, she argues that the district court erred in denying her Rule 29 motion for judgment of acquittal.[1]  After careful review of the record, the briefs, and the benefit of oral argument, we affirm the convictions on all counts.

---

[1] At trial, Dulce Castellanos filed a motion for judgment of acquittal as to each count against her.  The district court denied the motion on all counts; Dulce Castellanos' subsequent notice of appeal indicated her intent to appeal "all trial court rulings."  Despite this, Dulce Castellanos makes no mention on appeal of her motion for judgment of acquittal on any counts other than her drug conspiracy charge (Count 1).  The result of her failure to address the motion for judgment of acquittal as to the other two counts is discussed herein.

**TRIAL EVIDENCE**

The government's evidence showed the following at trial: On January 12, 2007, U.S. Immigration and Customs Enforcement (ICE) agents and Drug Enforcement Agency (DEA) agents began a narcotics investigation of Martin Castellanos (Dulce Castellanos' husband) and William Martinez (Dulce Castellanos' son-in-law). Over the course of several months, agents observed the suspicious activities of Martin Castellanos, William Martinez, and Dulce Castellanos. On January 23, 2007, agents observed William Martinez driving a red Expedition (registered to Nordis Martinez, Dulce Castellanos' daughter) from the Miami Gardens, Florida residence of Martin Castellanos and Dulce Castellanos[2] to a residence in nearby Opa-Lacka, where he remained briefly before returning to the Miami Gardens residence. William Martinez then drove to an apartment complex in nearby Davie, where he exited the Expedition, carried a

---

[2] At the evidentiary hearing on Dulce Castellanos' motion to suppress, the parties stipulated to the nomenclature of each of the residences at issue in this case. The residence of Dulce Castellanos and her husband, Martin Castellanos, at 5046 N.W. 186th Street, Miami Gardens, Florida, would be referred to as "the Miami Gardens residence." The residence at 11720 S.W. 24th Street, Miramar, Florida, would be referred to as "the Miramar residence." These names are used throughout this opinion. Further, this opinion refers to the residence of Nordis Martinez, Dulce Castellanos' daughter, at 8301 N.W. 179th Street, Hialeah, Florida, as "Nordis Martinez's residence." Finally, this opinion refers to the storage unit located at 6550 W. 29th Avenue, Hialeah, Florida, on which Dulce Castellanos paid rent, as "the Storage Unit."

duffle bag to a door on the second floor, and then emerged several minutes later empty-handed.

After William Martinez departed the Davie apartment complex, agents spoke to Neil Monroe, an occupant of one of the apartments that agents surmised William Martinez entered. Within the apartment, agents found traces of cocaine, marijuana residue, a scale, and the duffel bag William Martinez carried into the apartment. Agents took Neil Monroe into custody, at which time Monroe stated that William Martinez delivered cocaine to him weekly, including on that day. Neil Monroe also described an older Latin male, later identified as Martin Castellanos, who was known to deliver cocaine or pick up money from Neil Monroe on behalf of William Martinez.

On February 2, 2007, agents observed Dulce Castellanos driving a red Expedition, followed by Martin Castellanos in a silver car, near their Miami Gardens residence. The two vehicles slowed when approaching the agents' hidden location. The agents drove away, but Dulce Castellanos and Martin Castellanos followed the agents' vehicle for several blocks.

On February 15, 2007, agents observed Martin Castellanos, driving a black Ford F-150 pickup truck to the location of a cooperating source in Miami. There, he delivered $89,000 in cash wrapped in green plastic to the source and then drove

back to the Miami Gardens residence. On March 7, 2007, agents observed William Martinez depart the Miami Gardens residence in a silver Mercury Sable and drive to the Miramar residence (the utilities of which were registered in the name of Martin Castellanos). William Martinez remained inside the Miramar residence for a few minutes before returning to the Miami Gardens residence, first circling the Miami Gardens neighborhood several times before stopping at the home.

On March 13, 2007, agents again observed William Martinez at the Miramar residence, this time arriving with a rolling suitcase and later departing carrying a black trash bag with red handles which he placed into the rear of a black Ford F-150 pickup truck registered to Martin Castellanos. William Martinez drove the truck behind a shopping center for a moment and then drove back to the Miami Gardens residence—this time without the trash bag. Agents retrieved the trash bag from a dumpster behind the shopping center and found that the bag contained the rolling suitcase which was disassembled. The trash bag, to which narcotics dogs reacted, also contained surgical gloves and packaging material that an agent testified was consistent with kilogram wrappers of narcotics. On the basis of this evidence, agents obtained (but did not immediately execute) a search warrant for the Miramar residence.

On March 15, 2007 at approximately 1:00 p.m., agents observed Martin Castellanos leave the Miami Gardens residence in a white Honda and travel to a warehouse located off the Palmetto Expressway. At the warehouse, he pulled the Honda into a garage and drove away in a black Ford F-150 pickup truck. At that time, a Florida Highway Patrol officer initiated a traffic stop. A narcotics dog reacted to the vehicle and the officer thereafter searched the truck. Inside, the officer discovered approximately $81,000 in cash wrapped in green plastic and concealed inside a black trash bag with red handles (identical to that in which agents discovered the rolling suitcase). The officer also found keys to a Cadillac in the truck's center console.

DEA agents arrived on the scene and advised Martin Castellanos of his Miranda rights. Martin Castellanos agreed to speak with agents but gave them false information about his point of origin, his intended destination, and the money in the vehicle (which he claimed was the proceeds from a real estate sale and contended that he carried it on his person to conceal it from his wife, Dulce Castellanos, from whom he contemplated divorce and with whom he did not reside). Throughout this questioning, Martin Castellanos' mobile phone rang continuously. Although agents could not determine who was placing the calls (because the calling numbers were blocked), they inferred that the caller was the

6

intended recipient of the money and was calling to inquire as to the delay in delivery.

Moments after Martin Castellanos' arrest, agents at the Miami Gardens residence observed Dulce Castellanos outside the home looking around and appearing nervous. Standing near the red Expedition, Dulce Castellanos stared in the direction of the agents' vehicle parked three houses away, began walking towards her door, and backed up once to examine the vehicle again before finally entering the residence. She emerged less than fifteen minutes later carrying two heavy-appearing bags which she placed in the rear of the red Expedition and drove away. Agents, believing that Dulce Castellanos was leaving the residence with contraband, decided to pursue the vehicle. The agents signaled a traffic stop with sirens and lights, but Dulce Castellanos continued to drive at a slow rate of speed, once attempting to drive around an agent positioned in the road in front of her. She also crossed three lanes of traffic before agents successfully stopped the red Expedition.

The agents detained Dulce Castellanos, discovered two small children in the back seat, and conducted a search of the vehicle. During the search, agents identified two bags, one of which was a blue and grey duffel visible through the rear hatchback window of the vehicle. According to one agent, this bag resembled

7

the one William Martinez used to deliver cocaine to Neil Monroe's apartment on January 23, 2007. An agent opened the rear hatch of the Expedition and opened the duffel, finding that it contained bundles of cash totaling $120,628.00. The agent next opened a blue backpack situated adjacent to the blue and grey duffel and observed that it too contained cash, in the amount of $50,024.00, as well as a heat sealer, rubber bands, money straps, wrapping paper, and drug ledgers.

Agents subsequently questioned Dulce Castellanos, who stated that she did not own the Expedition or the bags inside, did not know the vehicle's owner, and was driving the vehicle because of a problem with her own car. When questioned about the bags, she stated that she placed the bags into the Expedition at Martin Castellanos' request. When agents informed her that she would be charged with conspiracy, she denied any involvement.

The red Expedition was moved to a parking lot, at which time agents seized the cash from the two bags, totaling $174,193.00, and continued to search the vehicle. They discovered a black briefcase containing wire transfer documentation linking Dulce Castellanos, William Martinez, Saul Wynter (also a co-defendant), and Martin Castellanos. From this documentation, agents discerned that Dulce Castellanos was paying rent on a local storage unit (the "Storage Unit"). Also in the briefcase was the red Expedition's registration

8

information, listed in the name of Nordis Martinez, Dulce Castellanos' daughter. Elsewhere in the vehicle, agents discovered a garage door opener for the Miramar residence.

Once in custody, Dulce Castellanos requested to speak with Martin Castellanos. After the two spoke in private, Martin Castellanos wrote a statement indicating that his wife had no involvement in the alleged conspiracy and did not place the bags into the red Expedition. Instead, according to Martin Castellanos, he loaded the money into the red Expedition for transport but failed to inform Dulce Castellanos that he intended to use the vehicle. He stated that by the time he was ready to drive the red Expedition, he realized that Dulce Castellanos had already departed.

Later that evening, agents executed their search warrant on the Miramar residence. The house was clearly a stash house, sparsely furnished and unoccupied. Inside, agents found utility bills in Martin Castellanos' name, drug ledgers, heroin packages (a total of eight kilograms, found in the air vents of a bedroom and in the kitchen), a Glock .8 caliber firearm and a .22 caliber revolver (both hidden in an air vent), a heat-sealer, digital scales, black electrical tape, and a large roll of green plastic wrap (the same wrap used on the heroin packages and on money previously recovered from Martin Castellanos).

9

In the garage of the Miramar residence, agents found a Cadillac to which narcotics dogs reacted. Agents unlocked the Cadillac with the keys found in the black Ford F-150 pickup truck and inside they discovered two hydraulically controlled hidden compartments containing $71,000 in cash wrapped in the green plastic now familiar to the agents.

Agents next obtained consent from Dulce Castellanos and Martin Castellanos, now detained, to search the Miami Gardens residence. There, agents found the following: a black duffel bag containing cash wrapped in green plastic (underneath the bed in the master bedroom); packaging material, a digital scale, $7,100.00 in cash inside a fanny pack, and an eyeglass case containing cocaine (all from a bedside table in the master bedroom); and $545.00 inside an envelope (from within a dresser drawer in the master bedroom). Agents thereafter released Dulce Castellanos and Martin Castellanos in order to continue surveillance and evidence gathering. To this end, on July 20, 2007, agents obtained and executed a search warrant for the Storage Unit, discovered to be tied to Dulce Castellanos through financial documents seized from the red Expedition. Inside, they found numerous wire transfer receipts, account statements, and other financial documents belonging to Dulce Castellanos and relating to several distinct bank accounts.

Dulce Castellanos was arrested on October 23, 2007. On November 7, 2007, a federal grand jury in the Southern District of Florida returned a superseding indictment charging her with conspiracy to possess with intent to distribute one kilogram or more of a substance containing heroin and five kilograms or more of a substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846 (Count 1), conspiracy to commit money laundering that allegedly took place between June 2003 and October 23, 2007, in violation of 18 U.S.C. § 1956(a)(1)(B)(I), all in violation of 18 U.S.C. § 1956(h) (Count 4), and money laundering that allegedly took place on March 15, 2007, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(I) and 1956(a)(2) (Count 6). The indictment also charged three other co-defendants with the conspiracy, including Martin Castellanos, William Martinez (both of whom are fugitives and were not tried with Dulce Castellanos), and Saul Wynter.

Before trial, counsel for Dulce Castellanos filed a motion to suppress evidence recovered in the red Expedition and in the Storage Unit. Following a hearing, the district court adopted a magistrate judge's report and recommendation recommending that the motion be denied. The magistrate judge found, and the district court agreed, that the agents' stop of the red Expedition was supported by probable cause to believe that Dulce Castellanos was engaged in criminal activity

11

and that the Expedition contained contraband or evidence of that criminal activity. In the alternative, according to the magistrate judge, there was at least reasonable suspicion for the stop and for a protective sweep of the Expedition and, after the protective sweep revealed the money, agents had probable cause to search the entire Expedition and to seize the contents thereof. Finally, because the magistrate judge found the search of the Expedition to be lawfully conducted, she rejected Dulce Castellanos' argument that the subsequent Storage Unit search was unlawful as fruit of the poisonous tree.

At trial, which commenced on February 5, 2008, the government presented evidence respecting the initial investigation that took place between January 12, 2007 and July 20, 2007, as outlined above. The government also provided more detailed information about the financial documents found linking Dulce Castellanos to the conspiracy. An agent testified that, within the black briefcase found in the Expedition, agents discovered: a Western Union wire transfer receipt (indicating that Saul Wynter, a co-defendant, sent "Eric Morillo" in Panama $700.00); a second Western Union wire transfer receipt (indicating that Dulce Castellanos paid $5,000.00 to Chase Home Finance); utility bills for the Miramar residence in Martin Castellanos' name; a cash register receipt noting payment by Dulce Castellanos of $5,015.00 on August 24, 2006; and U.S. Postal Service

12

Money Order receipts totaling $3,720.00. The agent also testified that Dulce Castellanos was carrying $3,541.00 in cash on her person when she was apprehended while driving the red Expedition.

To bolster its argument that Dulce Castellanos was involved in the financing of the drug conspiracy, the government presented testimony from an agent who searched the Storage Unit. The Storage Unit was leased to a third party, but Dulce Castellanos paid the rent for the unit. Inside the Storage Unit, agents found the following financial documents: a group of Bank of America bank statements addressed to Dulce Castellanos as the registered agent of a company called South Florida Diagnostic and Treatment Center, Inc.; Bank of America statements for a bank account held by A Sunrise and Associates Corp.; bank slips and deposit slips for a personal Bank of America account in Dulce Castellanos' name; Bank of America statements addressed to Dulce Castellanos and William Martinez for a joint bank account; and a Washington Mutual statement of accounts addressed to Dulce Castellanos.

To corroborate Dulce Castellanos' ties to these bank accounts and others, the government presented custodians of record to verify the account holders and account history on several accounts with which Dulce Castellanos was associated. Dulce Castellanos held four bank accounts at Bank Atlantic, two of which were in

13

her name alone and two of which were in the names of two minors (William Martinez, Jr. and Kaitlyn Martinez) with Dulce Castellanos designated as a co-signor.

A records custodian also connected Dulce Castellanos to nine Bank of America accounts. Of these, three were corporate accounts on which Dulce Castellanos was designated a signator: (1) an account registered to Sunrise Insurance, with Dulce Castellanos listed as president and Nordis Martinez listed as vice president; (2) an account in the name of Sunrise Insurance Agency Miami, Inc., with Dulce Castellanos listed as president and treasurer and with Nordis Martinez listed as secretary; and (3) an account registered to South Florida Diagnostic Treatment Center, Inc., with Dulce Castellanos listed as president. The remainder of these Bank of America accounts named Dulce Castellanos in some capacity, either as an account holder, co-signor, or "in trust for." Finally, the government called a records custodian from Washington Mutual Bank to testify to the existence of an account at that bank in the name of Dulce Castellanos.

Defense counsel objected to the testimony of these records custodians on relevancy grounds, contending that introduction of the documents shifted the burden of proof to Dulce Castellanos. The district court overruled the objection and admitted the evidence. On cross-examination, defense counsel suggested that

14

despite the existence of these numerous accounts, the government presented insufficient evidence to demonstrate that the money in the accounts derived from narcotics trafficking.

To illustrate the extent of the cumulative activity in Dulce Castellanos' numerous bank accounts, the government presented testimony from a DEA agent specializing in summarizing bank records and other documents relating to lifestyle and income. Although the agent could not identify the source of the deposits, his testimony laid the foundation for the introduction of a chart that compiled the major financial transactions in Dulce Castellanos' bank accounts between May 2, 2004 and August 8, 2007. These transactions included dozens of cash deposits in excess of $1,000.00 and at least one deposit reaching $7,000.00. Despite this income, the government presented testimony indicating that Dulce Castellanos and Martin Castellanos failed to file an income tax return for the years of 2005 and 2006.

To tie Dulce Castellanos to the drug activity, the government presented detailed testimony about the contraband recovered from the Miami Gardens residence. An agent testified that he and other agents recovered within the house: $23,011.00 inside a black duffel bag concealed underneath the master bedroom bed and wrapped in green plastic; $545.00 from an envelope inside a dresser

drawer in the master bedroom; $7,100.00 inside a fanny pack, a digital scale and small yellow plastic bags (both in the fanny pack), and an eyeglass case containing 38.9 grams of cocaine, all stashed in a bedside table in the master bedroom to the right of the bed; a digital scale in or on the master bedroom dresser; and a lease agreement with Martin Castellanos listed as lessee for the Miramar residence. With respect to this lease, an agent testified that he recovered money orders from the U.S. Postal Service showing that rent payments were made to the owner of the Miramar residence from an account in the name Martin Castellanos. The agent also testified that he obtained records of six money orders in $1,000.00 increments made payable from Dulce Castellanos to herself and deposited into her several Bank of America accounts.

In addition to evidence recovered from the Miami Gardens residence, the government produced evidence about certain financial documents and money found in Nordis Martinez's residence, where Dulce Castellanos testified that she lived at the time of her arrest. Inside that residence, agents recovered a wire transfer request for $32,000.00, a Western Union receipt for money orders purchased for $5,000.00, various receipts for cash purchases, and $14,000.00 in cash stashed under a chair cushion.

16

On February 12, 2008, at the close of the government's case-in-chief, defense counsel moved for a motion for judgment of acquittal as to Counts 1, 4, and 6 pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Defense counsel asserted that the government failed to present evidence that Dulce Castellanos agreed to be a participant in a drug conspiracy, failed to establish a nexus between the money discovered in the Expedition and the narcotics conspiracy, and failed to establish that the moving of money in the Expedition was a financial transaction affecting interstate and foreign commerce as required under the money laundering statute. The district court denied the motion with respect to all counts.

In the defense's case-in-chief, defense counsel presented witnesses who testified that Dulce Castellanos' conduct was legitimate. A friend of Dulce Castellanos, whose name appeared on the Storage Unit lease, testified that she obtained the lease in her name so that Dulce Castellanos could store some of her belongings outside the Miami Gardens residence without the knowledge of her husband, Martin Castellanos, with whom Dulce Castellanos had a tumultuous relationship. Another witness, Manuel Rodriguez, testified that Dulce Castellanos' income was legitimate: Rodriguez testified that he established a

company with Dulce Castellanos that was designed to ship packages to Cuba. Similarly, a witness named Gertrude Rosales testified that Dulce Castellanos had an immigration services business.

Dulce Castellanos then testified on her own behalf. She explained that she was currently living with Nordis Martinez but denied knowledge of the $14,000.00 found inside Nordis Martinez's residence underneath a chair cushion. Attempting to bolster her argument that she was legitimately employed, Dulce Castellanos corroborated the stories of Manuel Rodriguez and of Gertrude Rosales with respect to her shipping and immigration businesses and further testified that she and Nordis Martinez also opened an insurance company (A Sunrise Insurance) and a real estate company (InterAmerican Real Estate Group) together. Dulce Castellanos also testified that she and a doctor started a medical business called South Florida Diagnostic and Treatment Center.

Dulce Castellanos submitted that most of her clients paid her by cash, money order, or personal check, all of which she deposited upon receipt. She contended that all of the money in each of her accounts derived from these legitimate sources of income. When asked why she failed to file income tax returns in 2005 and 2006, Dulce Castellanos conceded that she failed to file but asserted that she had no deceptive or unlawful purpose in failing to do so.

18

When asked about her husband, Martin Castellanos, Dulce Castellanos explained that she never saw him with narcotics, scales, or any bags with money. She also denied having ever seen the fanny pack containing cocaine, the digital scales, or the money found in her master bedroom. She contended that she was driving the red Expedition on March 15, 2007 because the air conditioning in her vehicle was inoperable and Martin Castellanos told her to use his red Expedition. She testified that she placed the two bags into the Expedition because she removed them earlier and sought to replace them. She stated that she never opened the bags. She denied all charges against her.

Dulce Castellanos did concede, however, that she and Martin Castellanos shared a joint bank account and that she "wrote the checks" and "would pay the bills" from that account. This included rent payments for the Miramar residence, shown to be a stash house for narcotics and drug proceeds. Dulce Castellanos denied that she was aware of the nature of the Miramar residence.

After Dulce Castellanos testified, defense counsel renewed its Rule 29 motion. The district court again denied the motion as to all counts, emphasizing that because Dulce Castellanos testified, inconsistencies in the record created by her testimony tended to make the issue of her guilt or innocence one for the jury to decide, rather than for the court to determine.

On February 15, 2008, the jury returned a guilty verdict against Dulce Castellanos on Counts 1, 4, and 6 of the superseding indictment. The district court subsequently sentenced her to 121 months of incarceration as to each count, running concurrently, followed by 5 years of supervised release to each count, running concurrently, and a $300.00 special assessment. This appeal followed.

**DISCUSSION**

    I.    <u>District Court's Denial of Dulce Castellanos' Motion to Suppress</u>

        A.    <u>Standard of Review</u>

"'A district court's ruling on a motion to suppress presents a mixed question of law and fact.'" <u>United States v. Perez</u>, 443 F.3d 772, 774 (11th Cir. 2006) (quoting <u>United States v. Zapata</u>, 180 F.3d 1237, 1240 (11th Cir. 1999)). This Court accordingly reviews the district court's factual findings for clear error, construing all facts in the light most favorable to the government (the prevailing party below in this case). <u>Id.</u> The Court reviews the district court's application of the law to these facts de novo. <u>Id.</u>

        B.    <u>Motion to Suppress Evidence Recovered from the Red Expedition</u>

Dulce Castellanos argues first that—although defense counsel conceded at trial that the government had reasonable suspicion to stop the Expedition—agents

conducted an unlawful protective sweep of the vehicle by searching beyond the scope that any potential danger permitted. In the alternative, she contends that no probable cause existed to justify the agents' search of the bags inside the Expedition. Because we hold that probable cause existed to justify the search, we need not discuss Dulce Castellanos' first argument.

It is undisputed that the agents conducted a warrantless search of the Expedition. However, a warrantless vehicular search is permissible if law enforcement has probable cause to believe the vehicle contains contraband and if exigent circumstances necessitate a warrantless search or seizure. United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988). In most cases, the mobility of a vehicle is sufficient to satisfy the exigency requirement. Id. Here, the exigency requirement is satisfied because the vehicle was readily mobile: it was not only capable of mobility, but was in fact mobile at the time agents obtained control over it. See United States v. Forker, 928 F.2d 365, 369 (11th Cir. 1991) (holding that "ready mobility" of vehicle parked in a parking lot supported a finding of exigency because officers "were not certain if the car would remain in the parking lot if they left to obtain a warrant").

With respect to probable cause, such cause exists when, under the "totality of the circumstances," there exists "a fair probability that contraband or evidence

21

of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause does not require certainty; rather, it is a doctrine of "reasonable probability." United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995).

Probable cause existed here, under the totality of the circumstances, warranting a search of the Expedition. At the time they initiated the stop agents knew that William Martinez and Dulce Castellanos were associated because William Martinez frequented Dulce Castellanos' Miami Gardens residence and used the same Expedition she drove. Agents also had information showing that William Martinez moved drugs in the Expedition from Dulce Castellanos' Miami Gardens residence to the home of a drug buyer. Agents knew that Dulce Castellanos and Martin Castellanos were also associated and had information, based on the stop of Martin Castellanos in the black Ford F-150 pickup truck, tending to show that Martin Castellanos was in possession of drugs and currency. These connections, combined with Dulce Castellanos' nervous conduct and evasive behavior when confronted by agents, provided agents with a common-sense based "reasonable probability" that the vehicle would contain contraband. Thus, the vehicular search was lawful. Importantly, the legality of this search extended to the two bags (which were capable of containing drugs or currency or

both) within the Expedition. United States v. Ross, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

Dulce Castellanos maintains that agents lacked probable cause because they had little evidence at the time of the stop connecting her to the drug conspiracy. Her argument misses the point. The search was lawful because agents had enough evidence to establish probable cause that the object of the search—the vehicle itself, not Dulce Castellanos—contained contraband. See Gates, 462 U.S. at 238 (emphasizing that probable cause must exist that contraband "will be found in a particular place" (emphasis added)). Thus, the district court did not err in denying Dulce Castellanos' motion to suppress evidence found in the Expedition.

C.    Motion to Suppress Evidence Found in the Miami Gardens Residence

Dulce Castellanos also contends, based on her argument that the vehicular search was unconstitutional, that subsequent searches—including the search of her Miami Gardens residence—are similarly unlawful. This argument fails. Dulce Castellanos failed to object to the agents' search of her Miami Gardens residence on a motion to suppress before trial. She has accordingly waived her right to make

23

the argument on appeal. See Fed. R. Crim. P. 12(e) ("A party waives any Rule 12(b)(3) defense, objection, or request" that must be raised before trial, including a motion to suppress evidence, "not raised by the deadline the court sets . . . or by any extension the court provides."); Norelus v. Denny's, Inc., 628 F.3d 1270, 1296 (11th Cir. 2010) (citing "well-established rule against reversing a district court judgment on the basis of issues and theories that were never presented to that court—issues not raised in the district court should not be considered on appeal"). Although the court may grant relief from the waiver on a showing of good cause, no such cause exists here because, as explained above, the agents' search of the Expedition did not violate Dulce Castellanos' Fourth Amendment rights and the agents' subsequent search of the Miami Gardens residence was therefore not tainted.

II.    District Court's Denial of Dulce Castellanos' Rule 29 Motion for Judgment of Acquittal

A.    Standard of Review

We review a district court's denial of a motion for judgment of acquittal de novo. United States v. Bowman, 302 F.3d 1228, 1237 (11th Cir. 2002). The Court must, however, view the evidence in the light most favorable to the government, making all inferences and credibility choices in the government's

24

favor. United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997). Furthermore, "The test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence." United States v. Mieres-Borges, 919 F.2d 652, 656-57 (11th Cir. 1990) (internal quotation marks omitted).

### B. Rule 29 Motion for Judgment of Acquittal as to Count 1

Dulce Castellanos asserts that the district court erred in denying her Rule 29 motion for judgment of acquittal as to Count 1, conspiracy to possess with intent to distribute narcotics in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846. Specifically, she argues that the government presented no evidence demonstrating that she agreed to join the conspiracy, had knowledge of the drugs, and agreed to or intended to distribute drugs. Essentially, she contends that the government merely established her presence in proximity to the criminal conduct and that her presence alone was insufficient to establish her knowledge and agreement, both of which are required to sustain a conviction.

To sustain a conviction for possession with intent to distribute narcotics under 21 U.S.C. § 846, the government must establish beyond a reasonable doubt three elements: knowledge, possession, and intent to distribute. United States v.

Poole, 878 F.2d 1389, 1391 (11th Cir. 1989). To convict Dulce Castellanos of conspiracy to possess with intent to distribute narcotics, the government must prove: (1) that a conspiracy to possess narcotics existed; (2) that Dulce Castellanos knew of the goal of the conspiracy; and (3) that she voluntarily joined the conspiracy with knowledge thereof. See United States v. Mejia, 97 F.3d 1391, 1392 (11th Cir. 1996).

Based on the record below, we hold that the government met its burden at trial to establish that Dulce Castellanos agreed to join the conspiracy, had knowledge of the narcotics, and agreed to or intended to distribute the narcotics. While it is true that the evidence presented at trial was largely circumstantial as to Dulce Castellanos, it is well established that a "defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." United States v. Morales, 868 F.2d 1562, 1573 (11th Cir. 1989) (internal quotation marks omitted); see Poole, 878 F.2d at 1391-92 ("All three elements [of a 21 U.S.C. § 846 violation] can be proven by either direct or circumstantial evidence.").

With respect to her agreement to participate in the conspiracy, receipts found in the Expedition and in the Storage Unit showed that Dulce Castellanos

26

maintained several distinct bank accounts and made numerous wire transfers. She also admitted that she made rent payments on the Miramar residence, which was shown to be a stash house for narcotics and drug proceeds. Perhaps most convincingly, Dulce Castellanos was clearly observed moving large sums of money from her Miami Gardens residence to the red Expedition moments after agents apprehended her husband. Taken together, this evidence established beyond a reasonable doubt that Dulce Castellanos furthered the purpose of the conspiracy by participating in the financing aspect of the drug conspiracy: she controlled and concealed the drug proceeds and used proceeds to maintain the stash house, a critical asset to the conspiracy. Thus, the government proved beyond a reasonable doubt that Dulce Castellanos knowingly participated in the conspiracy.

With respect to Dulce Castellanos' knowledge of and agreement to distribute the drugs, the government also presented sufficient evidence. Agents found drugs and money in areas of Dulce Castellanos' master bedroom over which she exercised dominion and control: under the bed, on or in the only dresser in the bedroom, and in a bedside table. Further, it was reasonable for the jury to disbelieve Dulce Castellanos' testimony that she had no knowledge of the drugs, paraphernalia, and money because her testimony stood in stark contrast to this

27

abundant evidence of contraband within her control. This evidence, although circumstantial, was sufficient to establish that Dulce Castellanos had knowledge of the drugs in close proximity to her. Additionally, when paired with the evidence showing her involvement in the financing of the conspiracy, sufficient evidence existed to prove beyond a reasonable doubt that Dulce Castellanos agreed to participate in a conspiracy to sell the narcotics. See Morales, 868 F.2d at 1573-74 (upholding defendant's drug conspiracy conviction when government provided circumstantial evidence, including evidence that: (1) the defendant carried out of a stash house and into a car a mobile telephone used in drug transactions; (2) the defendant's girlfriend carried to the car a bag containing cocaine; (3) the defendant's name appeared as a co-signor on the lease agreement for the stash house; and (4) the defendant made rent and utility payments on the stash house).

Dulce Castellanos argues that a jury note to the district court provides telling evidence of the jury's belief that she was merely aware of—and did not agree to—the criminal conduct. The note indicated that members of the jury "believe [Dulce Castellanos] was fully aware of the operation but . . . cannot figure out the amount [she] would have conspired on." This argument is unavailing. The note plainly demonstrates only that the jury had difficulty discerning the actual amount of drugs that were the subject of the conspiracy. Nothing in the note

28

suggests that the jury was unsure whether the conspiracy existed or whether Dulce Castellanos agreed to participate.

Accordingly, the district court did not err in denying Dulce Castellanos' Rule 29 motion for judgment of acquittal as to Count 1.

        C.     <u>Rule 29 Motion for Judgment of Acquittal as to Counts 4 and 6</u>

Dulce Castellanos initially indicated her intent to appeal "all trial court rulings," presumably including the district court's denial of her Rule 29 motion for judgment of acquittal as to Counts 4 and 6, in her notice of appeal. Despite this, appellate counsel has not briefed any arguments for reversal based on the original Rule 29 motion on Counts 4 and 6. These arguments are accordingly waived. <u>See In re Egidi</u>, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); <u>Sepulveda v. U.S. Att'y Gen.</u>, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) ("When an appellant fails to offer argument on an issue, that issue is abandoned." (citing <u>U.S. v. Cunningham</u>, 161 F.3d 1343, 1344 (11th Cir. 1998))); <u>see also</u> Fed. R. App. P. 28(a)(9)(A) (providing that argument section of an appellant's brief must contain "appellant's contentions and the reasons for them,

with citations to the authorities and parts of the record on which the appellant relies").[3]

**CONCLUSION**

Dulce Castellanos' conviction is AFFIRMED.

---

[3] To the extent that Dulce Castellanos' argument as to why the district court erred in denying her Rule 29 motion on Counts 4 and 6 simply relies on her lack of knowledge or specific intent with respect to the drug conspiracy, the preceding discussion adequately refutes this contention. Regardless, the Court finds no plain error in the district court's ruling on the Rule 29 motion for judgment of acquittal as to Counts 4 and 6.